# Illinois Official Reports

## Appellate Court

**People v. Fretch, 2017 IL App (2d) 151107**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. IAN F. FRETCH, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-15-1107 |
| Filed<br>Rehearing denied | March 16, 2017<br>April 21, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 14-CM-2451; the Hon. James D. Orel, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Emily Eisner, of Law Office of Emily Eisner, of Chicago, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa A. Hoffman and Mary A. Fleming, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BIRKETT delivered the judgment of the court, with opinion.<br>Justices Hutchinson and Zenoff concurred in the judgment and opinion. |

**OPINION**

¶ 1      Following a bench trial, defendant, Ian F. Fretch, was convicted of several offenses based on evidence that he knowingly exposed his penis and masturbated in the presence of G.G., a female minor. Defendant brings four main contentions on appeal: (1) the trial court erred in admitting other-acts evidence; (2) the evidence was insufficient to support defendant's convictions; (3) defendant's trial counsel was constitutionally ineffective in various respects; and (4) the trial court was not authorized to sentence defendant to a two-year period of probation to run consecutively to a 360-day term of imprisonment. We reject all four contentions and affirm.

¶ 2                                                  I. BACKGROUND
¶ 3                          A. Rulings on Other-Acts Evidence and the Parties'
                                   Stipulation to a Partly Closed Trial

¶ 4      On July 20, 2014, the State brought a three-count misdemeanor complaint against defendant, charging him with sexual exploitation of a child (720 ILCS 5/11-9.1(a)(2) (West 2014)), public indecency (720 ILCS 5/11-30(a)(2) (West 2014)), and disorderly conduct (720 ILCS 5/26-1(a)(1) (West 2014)). The common allegation in all three counts was that, on July 19, 2014, defendant knowingly exposed his penis to G.G. and masturbated. The disorderly conduct count additionally alleged that defendant waved his hand at G.G. while masturbating. G.G. was 14 years old at the time of the charged offenses.

¶ 5      In advance of trial, the State filed a motion *in limine* to introduce other-acts evidence. In its motion, the State described two incidents that occurred prior to the date of the charged offenses. The State submitted with its motion the police reports that were generated in connection with the incidents.

¶ 6      First, the State alleged that, on May 18, 2010, defendant, who was then 29 years old, approached C.K., a female minor, at the Elmhurst Public Library. Defendant began a conversation with C.K., who was using a library computer. At his request, C.K. added defendant to her MySpace account. Defendant then sat at a nearby computer and began to send C.K. sexually suggestive remarks through MySpace. Defendant asked C.K.'s age, and she replied that she was 14 years old. After learning this, defendant continued his overtures, stating that C.K. was "sexy" and asking if she would be his "sexy little girl." At that point, C.K. terminated her MySpace contact with defendant and informed the library staff of the incident. The staff in turn notified the police, who arrested defendant. During a custodial interview, defendant admitted that he might have made a sexually suggestive remark to C.K. after he learned her age. Defendant was charged with disorderly conduct. He pled guilty and was sentenced to 30 days in jail.

¶ 7      The second alleged incident occurred on July 17, 2014, two days before the charged offenses. G.G. (the victim of the charged offenses) was walking with her 13-year-old friend, S.M., from G.G.'s home to a CVS store on North Avenue in Elmhurst. As they walked, defendant drove past and blew kisses at them. Later, while G.G. and S.M. were in the backyard of G.G.'s home, they observed defendant standing outside, a few houses away. Defendant blew kisses at G.G., thrust his hips at her in a "humping motion," and then placed his finger on his lips, apparently signaling G.G. to be quiet.

¶ 8 The police report detailing the July 17 incident went on to describe G.G.'s complaint on which the State based the present charges. G.G. told police that, on July 19, 2014, she was walking on the sidewalk across the street from defendant's home, which was two houses away from hers, when she observed defendant standing in his doorway. His left hand was on his exposed penis as he waved G.G. over with his right hand.

¶ 9 The State argued in its motion that the May 2010 incident was relevant as showing *modus operandi*. The State also contended that the May 2010 incident would have the further purpose, shared by the July 17, 2014, incident, of showing intent or absence of mistake. Elaborating, the State noted that it would present evidence at trial that defendant told police that "it was just a coincidence [that] he was masturbating as G.G. walked by." The State contended that the other-acts evidence would rebut the claim of coincidence.

¶ 10 The court heard the motion *in limine* on the first day of trial. Defense counsel submitted that the May 2010 incident was too dissimilar to the charged offenses to show *modus operandi*. Counsel also suggested that it was premature for the court to decide whether the other-acts evidence had bearing on intent or absence of mistake because the defense had not yet decided whether to make intent an issue in the case. Counsel explained:

> "[W]e don't know quite frankly yet, based on the evidence that the State has submitted in its brief, whether or not the defendant is admitting to the conduct that's [*sic*] he's being accused of or if he flat out denies it."

Accordingly, counsel asked the court to reserve ruling on whether the other-acts evidence was pertinent to intent or absence of mistake. Counsel also commented, however, that any of the other-acts evidence would "have an overly prejudicial effect as opposed to its probative value."

¶ 11 The State asked for an immediate ruling. The State anticipated that intent would be an issue at trial, with defendant arguing that he "never even saw [G.G.]" when he was masturbating. The trial court granted the motion, finding that all of the other-acts evidence was relevant to show intent. The court further determined that the prejudicial impact of the evidence would not substantially outweigh its probative value.

¶ 12 Defendant signed a jury waiver. The State then presented a stipulation from the parties that, during the testimony of G.G. and S.M., the courtroom would be closed to spectators except for the parents of the two minors. The court confirmed with defense counsel that the defense was so stipulating. The court restricted the courtroom as agreed during G.G.'s and S.M.'s testimony.

¶ 13 B. Other-Acts Evidence at Trial

¶ 14 C.K. testified that, at about 2 p.m. on May 18, 2010, she was at the Elmhurst Public Library. She was 14 years old at the time. She was accessing her MySpace account on a library computer when she noticed defendant staring at her from about six feet away. The staring made C.K. somewhat uncomfortable, and she looked away after making eye contact with defendant. Defendant approached and sat down next to C.K. He made a comment about a nearby library patron who was not wearing shoes. C.K. laughed at the remark. Defendant noticed that C.K. was on MySpace. He wrote his email address on a slip of paper and told C.K. to add him to her MySpace account. After C.K. did so, she began receiving messages from defendant. In his first message he wrote, "[Y]ou're sexy. You have sexy hips. I'm 22. How old

are you?" C.K. wrote in response that she was 14. Defendant then commented that he felt that C.K. was older, perhaps 18 or 19. He asked if he could call C.K. "his sexy girl." C.K. said in reply, "I'm 14, and you're 22. That's disgusting." Defendant then wrote, "[Y]ou're sexy." At that point, C.K. felt frightened. She deleted defendant from her MySpace account, logged off the computer, and went to the front desk. The police were called, and defendant walked away. C.K. testified that no printout existed of her MySpace conversation with defendant.

¶ 15    Elmhurst police sergeant Michael Campise testified that, at about 7 p.m. on May 18, 2010, he interviewed defendant in the booking area of the police station. At the outset of the interview, defendant commented that he knew why Campise was there. Defendant then asked Campise if it was "wrong or unreasonable for a guy to check out a girl that's [*sic*] wearing tight pants that shows [*sic*] off her figure." Campise asked defendant his age. Defendant said that he was 29. Campise informed defendant that C.K. was only 14. Campise then asked defendant what occurred in the library. Defendant said that he sat down next to C.K. and "started some small talk" about some shoes that were under the table. C.K. invited defendant to join her MySpace account so that they could message each other. Defendant joined C.K.'s account and they began to exchange messages. Defendant admitted that some of the talk was "sexually suggestive." For instance, defendant commented to C.K. that she had "a sexy, curvy look to her." According to defendant, he and C.K. eventually broached the topic of age. She told him that she was 14, and he replied that they probably should not be talking. C.K. went to the front desk. At that point, defendant felt "terrible" about the conversation and wanted to apologize to C.K. He decided against it and left the library.

¶ 16    Campise testified that defendant initially denied making any sexual remark to C.K. after learning that she was 14. Later in the interview, however, defendant admitted that he "probably or might have" asked C.K. after learning her age if she "would be a sexy little girl."

¶ 17    S.M. was 14 years old at the time of trial (March 17, 2015). She testified that, between 1 p.m. and 2 p.m. on July 17, 2014, she arrived at her friend G.G.'s home on Columbia Avenue in Elmhurst. After a short while, the two became bored and decided to walk to the nearby CVS store to buy Silly String. The CVS was at the intersection of North Avenue and York Street. As they walked west on the south sidewalk along Columbia Avenue (an east-west road), a black Jeep with silver rims slowed down to keep pace with them. S.M. estimated that the Jeep was 10 feet from them. S.M. observed that the driver's window was halfway down. She did not get a clear look at the driver, but she saw that he was a male. There was no one else in the Jeep. S.M. saw the driver blow a kiss at her and G.G. and also wave at them. The gestures made S.M. uncomfortable and she turned her attention from the driver. After another minute and a half, the Jeep sped up past them. S.M. and G.G. took a diagonal shortcut to the CVS by passing through the parking lot of a Jersey Mike's. As they neared the CVS, S.M. saw what looked like the same Jeep at a stoplight on York Street. This time, S.M. did not see the driver. The Jeep continued on York Street and turned into an alley. S.M. became concerned for their safety and urged G.G. to call her brother for advice. They ultimately did not call him.

¶ 18    S.M. testified that she and G.G. remained in the CVS for an hour and 15 minutes. They stayed so long to make sure that the Jeep had left. During their stay, they purchased Silly String. When they set out back toward G.G.'s home, they took the same route, including the shortcut. As they walked east on the south sidewalk along Columbia Avenue, approaching an intersection two houses from G.G.'s home, they noticed the same Jeep driving slowly a short distance behind them. S.M. sensed that the Jeep was following them. She and G.G. panicked

and ran screaming to G.G.'s house to get the attention of her parents. The Jeep did not follow them to the house but turned at the intersection and "sped off." S.M. did not see the driver at that time.

¶ 19    S.M. stated that, when they arrived at G.G.'s, her mother directed them to remain in the home as she went out to see if the Jeep had returned. Later, at about 4:30 p.m., S.M. and G.G. went to the backyard and had a "silly string fight." As they were cleaning up the string, S.M. observed the same Jeep arrive next door or two houses down. The Jeep parked on a concrete slab at the back of the house. S.M. saw the driver exit the Jeep. She could not see him clearly, because her line of sight was partially obscured by a boat that was parked in G.G.'s driveway. The driver faced S.M. and G.G. and made a "kissy face or like a kiss motion with his hand," similar to the gesture he made previously. The driver then put his finger to his lips as if telling them to keep quiet. After lighting a cigarette, the driver thrust his hips in G.G.'s direction in a "humping motion." S.M. then looked away and stopped paying attention to the driver. She and G.G. finished cleaning up the Silly String, which took about five seconds, and then went inside the house. They continued to watch the Jeep from there. S.M. testified that she was not familiar with G.G.'s neighborhood and had not seen the Jeep before that day. S.M. identified defendant in court as the person she saw driving the Jeep.

¶ 20    G.G. testified that S.M. came to G.G.'s home at about 3 p.m. on July 17, 2014. They decided to walk to the CVS at North Avenue and York Street to buy Silly String. As the two walked along Columbia Avenue, G.G. saw a black Jeep with silver rims slowly following them. The driver's window was partly down and the driver, a male, blew a kiss in their direction. G.G. did not recognize the driver at that time. After the driver made his gesture, G.G. and S.M. crossed Columbia Avenue and took a shortcut through a parking lot to the intersection of North Avenue and York Street. The Jeep did not follow them into the parking lot but proceeded to a stop sign on Columbia Avenue. According to G.G., she decided on the shortcut not because of the driver's gesture, but because it was her normal route to walk to the CVS.

¶ 21    When G.G. and S.M. reached the CVS, G.G. saw the Jeep drive down a nearby alley. G.G. and S.M. spent two hours inside the CVS and purchased Silly String. They walked home using the same shortcut. When they were almost back home, G.G. saw the Jeep following them again. At the intersection of Columbia Avenue and Willow Road, which was near her house, the Jeep made a wide right turn onto Willow Road. The driver's window was partly down, and the driver pointed at G.G. and S.M. This time, G.G. got a "good look" at the driver. He looked "very familiar" but she could not place him. After the driver made his gesture, G.G. and S.M. ran to G.G.'s home and told her mom that there was a stalker.

¶ 22    G.G. testified that, about 20 to 30 minutes after they arrived home, she and S.M. went into the backyard and had a fight with the Silly String. While they were outside, they observed the same Jeep pull into the driveway of the residence two houses down, at the corner of Columbia Avenue and Willow Road. When the driver exited the Jeep, G.G. finally recognized him as her neighbor from that residence, whom she had seen around the neighborhood for years. As before, the driver blew a kiss at G.G. and S.M. He also put his finger to his lips, motioning them to be quiet. Moreover, G.G. could "almost remember [the driver] doing like a humping motion." After the driver made these gestures, G.G. and S.M. quickly cleaned up the Silly String and went inside. G.G. identified defendant in court as the driver of the Jeep and the neighbor she recalled seeing around the neighborhood. Defendant was typically smoking when

she saw him. They had never interacted, nor had he waved to her, before July 17.

¶ 23                                    C. The Charged Incident

¶ 24        G.G. also testified to an incident that occurred two days later, on July 19, 2014. About 1 p.m. on that date, G.G. was walking on the sidewalk on Columbia Avenue near her home. She was on a FaceTime video call with S.M., who was on a camping trip. G.G.'s neighbor was having a garage sale and other people were walking on the sidewalk. G.G. paced as she talked. She began by walking east from her house (away from defendant's home). After she walked down about two homes, she crossed the street and walked back west, toward the intersection of Columbia Avenue and Willow Road. She passed her home on the opposite side of Columbia Avenue. When she was across from defendant's home, she saw him on the front porch smoking. She then walked back east, crossed Columbia Avenue, and walked west to her home. She then repeated the route, walking east on Columbia Avenue. This time, when she was across Columbia Avenue from defendant's home, she saw defendant inside his home. She saw him through the screen door, which was screened at the top but solid on the bottom. G.G. was "pretty sure" that defendant was removing his clothes. They made eye contact. G.G. did not tell anyone, because she was still on the phone with S.M. Also, she had not "put *** it together *** what [defendant] was doing."

¶ 25        G.G. testified that, after seeing defendant undressing, she turned back east and walked the same route again. When she was across the street from defendant's home the third time, she heard someone say, "Hey." She turned and saw that it was defendant who was trying to get her attention. He was standing behind the screen door. The screened portion of the door was "below [defendant's] waist level," and G.G. could see that he was naked and masturbating. They made eye contact, and defendant "waved for [her] to come in." He masturbated with his left hand and waved with his right. G.G. decided to take a photograph to prove what defendant was doing. Since the camera phone she was carrying was out of storage, she went back to her home and found an older camera phone with storage. G.G.'s mother was home but G.G. did not tell her what she saw. G.G. crossed the street and returned to her earlier vantage point. Defendant was still masturbating. G.G. did not want defendant to know that she was photographing him, so she pretended she was still on FaceTime when she took two or three photographs. When G.G. took the photos, defendant opened the screen door and thrust his penis through the doorway. He then shut the door and continued to masturbate. Frightened, G.G. ran home and told her mother that defendant was masturbating.

¶ 26        The State introduced two photographs, which G.G. identified as the photographs she took of defendant's home while he was masturbating. The first photograph shows the front of the home, but the screened portion of the door is dark and no one is visible behind the door. The second photograph is a close-up image of the front porch and the screen door. G.G. testified that she took this image by using the zoom function of the camera phone. Behind the screen door is the figure of a person, who defense counsel admitted in closing argument is defendant. The image is grainy; defendant is visible as a flesh-colored silhouette of a head and a torso. His individual features are not visible. We describe the photo in greater detail below. *Infra* ¶ 93. G.G. noted that the photographs were taken before defendant opened the door and thrust his penis through the doorway.

¶ 27        The State's next witness was Elmhurst police detective Steven Mandat. He testified that he spoke with defendant in the lock-up area of the police station on the afternoon of July 19, 2014.

Defendant asked what was going on with the investigation. Mandat told him that the matter involved G.G. Defendant waived his *Miranda* rights and agreed to speak with Mandat, who then led defendant to an interview room. Mandat's video and audio recording of the interview was introduced into evidence and played for the trial court.

¶ 28 The recording is 90 minutes, more than half of which shows defendant by himself in the interview room. The remainder of the recording is defendant's interview with Mandat and another police officer. At the beginning of the interview, Mandat told defendant that the matter involved G.G. Defendant replied that G.G. was too young for him to be interested. Mandat asked defendant if he waved to G.G. two days ago while driving his Jeep. Defendant claimed that he did not recall seeing G.G. on that date but admitted that he might have previously waved to her in a "neighborly" way. Defendant denied that he is a pedophile or that he would ever try to lure G.G. into his Jeep. Defendant further denied that he exposed his penis to G.G. on July 19. Defendant admitted that he might have gone to his front door earlier that day while "topless." Defendant later admitted that he was actually fully nude when he went to the front door. He explained that he took a bath earlier that day after finishing a plumbing project and was naked as he walked through the house. He admitted that, while still naked, he went to the front door to check whether any mail was stuck in the slot of the screen door. This involved opening the screen door to check the front of the door. Defendant initially stated that, as he checked the mail, he touched his genital area because he was itchy. Defendant later admitted that he was naked and masturbating to pornography while inside the house. Still naked and continuing to masturbate, he opened the screen door to check for stuck mail. Defendant denied that he saw G.G. outside while he checked the mail slot. He acknowledged that, if G.G. were outside unbeknownst to him, she might have misinterpreted his actions as a wave with his hand. Defendant denied that he found G.G. attractive.

¶ 29 On cross-examination, Mandat acknowledged that one of the interrogation tactics he used in the interview was to state questions or observations that assumed facts that defendant had yet to accept. For instance, Mandat asked defendant at one point, "What about when you were masturbating by your front door?" In this way, Mandat was asking defendant to "[a]ccept certain details of what happened."

¶ 30 After the State rested its case, defendant testified in his own defense. Asked about the incident at the Elmhurst library in May 2010, defendant claimed that C.K.'s MySpace page reported her age as 18. Defendant claimed that he found out only after their interaction that C.K. was 14. Defendant also admitted, however, that C.K. "may have" told him during their MySpace exchange that she was 14. Defendant also "may have" found C.K. attractive.

¶ 31 Defendant further testified that, on July 17, 2014, he was residing with his parents and working full-time delivering appliances. He drove a Jeep when not at work. After finishing work at 3 p.m. on July 17, he ran errands in the Jeep. Defendant knew on July 17 that G.G. was his neighbor, but he did not recall seeing her or S.M. that day.

¶ 32 Defendant testified that, on July 19, he and a friend completed a plumbing project at his home. Defendant took his parents to the train station at 12:30 p.m. and his friend left at 2:30 p.m. Afterward, defendant was in the house alone. He took a bath, wrapped himself in a towel from the waist down, and phoned for a pizza delivery to his friend's home, where he planned to join him later. Still wearing just the towel, he went to the front of the house to close the inner door, which had been left open to let air through the screen door. He did not open the screen door. He did not see G.G. outside when he was at the door. Defendant denied that he was naked

from the waist down or masturbating while at the door. Defendant claimed that G.G. was too young to be attractive to him. Defendant denied that he has a "thing" for 14-year-old girls or an interest in public masturbation.

¶ 33    Defendant was shown the two photographs taken by G.G. Defendant claimed that he could not tell from the close-up photograph of the door and the porch whether he was facing outside. According to defendant, he would have faced the inner door while preparing to close it.

¶ 34    As to the interview with Mandat, defendant denied that he said that he masturbated at his front door on July 19. He testified that his references to masturbation were in the nature of a hypothetical. Mandat was offering hypotheticals and defendant was "giving him hypotheticals back." Defendant was "flustered" and "very confused" by Mandat's rapid questions. Because of the "suggestive nature" of those questions, defendant "didn't think [he] was free."

¶ 35    In closing argument, defense counsel asserted, consistently with defendant's testimony, that at no time on the afternoon of July 19 was defendant nude or masturbating at his front door. Counsel acknowledged that the close-up photo of defendant's home showed him inside the screen door, but counsel denied that the photo corroborated G.G.'s account in any further respect. Counsel further argued that defendant's confession to Mandat was not truthful but rather was defendant's adoption of a false narrative suggested by Mandat.

¶ 36                            D. The Trial Court's Ruling

¶ 37    The trial court found defendant guilty on all three counts. The court considered the case one of "credibility" and found G.G. and S.M. "extremely credible with great recall of the events." The court accepted their accounts of July 17 as well as G.G.'s account of July 19. The court considered defendant's statement to Mandat that, on the afternoon of July 19, he was naked and masturbating when he opened his screen door to check for mail. The court rejected defendant's suggestion at trial that he was only addressing hypotheticals in the interview with Mandat. Thus, the court found that defendant was speaking truthfully when he admitted that he went to the front door while naked and masturbating. The court found that the May 2010 library incident involving C.K. and the July 17 incidents involving G.G. and S.M. were pertinent to the issue of intent, specifically, to whether defendant knowingly exposed his penis and masturbated in G.G.'s presence. The court further found that G.G.'s close-up photograph of the front door, albeit "not specifically clear," showed a "total[ly] naked man" behind the screen door. As such, the photo corroborated G.G.'s account of the events on July 19 as well as defendant's admission to Mandat that he went to his front door while naked and masturbating.

¶ 38    On the sexual-exploitation and public-indecency counts, both Class A misdemeanors (see 720 ILCS 5/11-9.1(a)(2), 11-30(a)(2) (West 2014)), the court sentenced defendant to 360 days in jail and two years of probation. The court imposed a 30-day concurrent jail term on the disorderly conduct count. The court granted credit against both sentences for the 188 days defendant had spent in custody.

¶ 39                            E. Posttrial Motions

¶ 40    Defendant, by new counsel, filed two posttrial motions. The first was a motion for judgment notwithstanding the verdict or for a new trial. The motion brought multiple allegations of error, including a claim of ineffective assistance of trial counsel. After hearing argument on the motion, the trial court denied it except for the claim that one of defendant's

convictions violated the one-act, one-crime doctrine. See *People v. Johnson*, 368 Ill. App. 3d 1146, 1163 (2006) ("The one-act, one-crime doctrine prohibits multiple convictions when (1) the convictions are carved from precisely the same physical act or (2) one of the offenses is a lesser-included offense of the other."). The court determined that the sexual-exploitation and public-indecency convictions were based on the same act. Consequently, the court vacated the public-indecency conviction. We discuss other aspects of the motion in our analysis below. *Infra* ¶¶ 116-41.

¶ 41 The second posttrial motion was a motion to reduce the sentence. Defendant construed the applicable sentencing provisions to mean that, for a Class A misdemeanor, any combination of imprisonment and probation must not in the aggregate exceed the maximum term of imprisonment allowable for such a misdemeanor, which is 364 days. See 730 ILCS 5/5-4.5-55(a) (West 2014) (for a Class A misdemeanor, "[t]he sentence of imprisonment shall be a determinate sentence of less than one year"); 730 ILCS 5/5-6-2(f) (West 2014) ("The court may impose a term of probation that is concurrent or consecutive to a term of imprisonment so long as the maximum term imposed does not exceed the maximum term provided under Article 4.5 of Chapter V [(730 ILCS 5/5-4.5-5 *et seq.* (West 2014))] or Article 8 of this Chapter [(730 ILCS 5/5-8-1 *et seq.* (West 2014))]."). Defendant submitted that, since he had already served 360 days in jail (given good-time credit), a term of probation would exceed the statutory limit of 364 days. The trial court rejected defendant's interpretation of the sentencing statutes. The court retained the sentence of probation but reduced the term of imprisonment to 180 days to reflect time served.

¶ 42 Defendant filed this timely appeal.

¶ 43 II. ANALYSIS

¶ 44 Defendant raises several contentions on appeal. We address them as follows.

¶ 45 A. Other-Acts Evidence

¶ 46 Defendant challenges the admission of the State's other-acts evidence, which consist of (1) defendant's interaction with C.K. in May 2010, in which he persisted with his sexually charged overture even after learning that she was 14 years old and (2) defendant's conduct on July 17, 2014 (two days before the charged offenses), where he followed G.G. and S.M. in his Jeep and blew kisses and made a "humping" motion at them. Defendant argues that this evidence was inadmissible because it was relevant only to show that he had a propensity to target underage girls. Defendant is incorrect.

¶ 47 Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011) provides that, with certain exceptions not pertinent here, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence "may *** be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Rule 404(b) codifies the common-law rule that "[e]vidence of a crime or other bad acts for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's propensity to commit crime." *People v. McGee*, 2015 IL App (1st) 122000, ¶ 25. "Evidence of other crimes [or bad acts] is objectionable not because it has little probative value, but rather because it has too much." *People v. Manning*, 182 Ill. 2d 193, 213 (1998). The danger is that the fact finder will "convict the defendant only because it feels that defendant is a bad person

who deserves punishment." *Id.* at 213-14. "[T]he law distrusts the inference that, because a person committed other crimes or bad conduct, he is more likely to have committed the crime charged." *People v. Brown*, 319 Ill. App. 3d 89, 99 (2001). Thus, where the other-acts evidence "has no value beyond that inference, it is excluded." (Internal quotation marks omitted.) *Manning*, 182 Ill. 2d at 214. Even other-acts evidence that is relevant for a proper purpose will be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *People v. Pikes*, 2013 IL 115171, ¶ 11; see also Ill. R. Evid. 405 (eff. Jan. 1, 2011). The trial court's admission of other-acts evidence will be upheld on appeal unless the court abused its discretion. *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court. *Lake Environmental, Inc. v. Arnold*, 2015 IL 118110, ¶ 16.

¶ 48   The trial court here found that the other-acts evidence was pertinent to defendant's intent in the alleged act of exposing his penis to G.G. and masturbating in his front doorway. Count I of the complaint charged sexual exploitation of a child, which occurs when a person "in the presence or virtual presence, or both, of a child and with knowledge that a child *** would view [his] acts, *** exposes [his] sex organs *** for the purpose of sexual arousal or gratification of such person or the child." 720 ILCS 5/11-9.1(a)(2) (West 2014). Count II, the conviction of which was later vacated pursuant to the one-act, one-crime rule, charged public indecency. That offense occurs when a person "performs *** in a public place *** [a] lewd exposure of the body done with intent to arouse or to satisfy the sexual desire of the person." 720 ILCS 5/11-30(a)(2) (West 2014). Count III charged disorderly conduct, which occurs when a person "knowingly *** [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1(a)(1) (West 2014). All three counts alleged that defendant was aware of G.G.'s presence across the street when he exposed his penis and masturbated. The trial court specifically found that the evidence of defendant's prior lewd conduct toward G.G. and other underage girls challenged defendant's statement to Mandat that he had no intent to expose himself to G.G. or anyone else when he was naked and masturbated at his front door on the afternoon of July 19.

¶ 49   We address first defendant's contention that, because he did not make intent an issue at trial, the trial court could not properly admit the other-acts evidence as to intent. Defendant observes that, in closing argument, defense counsel's position was not that defendant masturbated at his door without the requisite intent, but that he simply did not masturbate at his door. Thus, according to defendant, he presented no theory on intent at all. Defendant compares this case on the facts to *People v. Illgen*, 145 Ill. 2d 353 (1991), where the admission of other-acts evidence was upheld, and to *People v. Hansen*, 313 Ill. App. 3d 491 (2000), *People v. Bobo*, 278 Ill. App. 3d 130 (1996), and *People v. Gibbs*, 226 Ill. App. 3d 1068 (1992), where the admission of other-acts evidence was reversed. Defendant claims that this case is closer factually to *Hansen*, *Bobo*, and *Gibbs* than to *Illgen*.

¶ 50   We begin our discussion with a more recent supreme court case, *People v. Wilson*, 214 Ill. 2d 127 (2005), where the court addressed whether other-acts evidence was properly admitted in the defendant's prosecution for aggravated criminal sexual abuse. The information alleged that the defendant, a school teacher, touched the breasts of two female students for sexual gratification. The trial court granted the State's motion to introduce the testimony of other students who claimed that the defendant touched them in a sexual way. The supreme court

affirmed the admission of the other-acts evidence. The court began its discussion by noting a split in the case law over the grounds for admission of other-acts evidence as to intent:

> "Aggravated criminal sexual abuse, as it was charged here, is a specific-intent crime—the State must show defendant intentionally or knowingly touched the victim on the breast for purposes of sexual gratification. In cases involving specific-intent crimes, some courts hold that intent is automatically at issue for purposes of deciding whether to admit other-crimes evidence, regardless of whether the defendant has made intent an issue in the case. [Citations.] Other courts have taken the opposite approach. [Citation.]" *Id.* at 137.

Thus, the court attempted to stake out the divergent positions on a threshold requirement for admission of other-acts evidence on intent: that intent be "at issue" in the case. This basic requirement has a long pedigree in Illinois. See *People v. Lane*, 300 Ill. 422, 424 (1921) ("[W]here the intent with which an alleged offense has been committed is a material element of the charge *and becomes an issue on the trial*, proof of former similar offenses within certain reasonable limits, may be received *** for the purpose of showing [the defendant's] knowledge and guilty intent." (Emphasis added.)); *People v. Davis*, 248 Ill. App. 3d 886, 892 (1993) ("Other crimes evidence may not be used to show intent or motive when intent or motive *is not an issue* in the case." (Emphasis added.)). The *Wilson* court noted the following two opposing positions on when intent is at issue in a case: (1) intent is automatically at issue whenever the charged offense is a specific-intent crime, and (2) intent is at issue only where the defendant *makes* intent an issue.

¶ 51   The *Wilson* court cited a case from this district, *People v. Deenadayalu*, 331 Ill. App. 3d 442 (2002), as standing for the position that intent is automatically at issue, for purposes of other-acts evidence, where the alleged offense is a specific-intent crime. Interestingly, the *Wilson* court did not cite any Illinois decision for the "opposite approach"; the court cited only a Vermont decision, *State v. Lipka*, 817 A.2d 27 (Vt. 2002). The court in *Lipka* subscribed to the general proposition that, "[t]o be admissible, *** prior bad act evidence must be relevant to 'an element of the offense or the defense that is *genuinely in issue*.' " (Emphasis added.) *Id.* at 38 (quoting *State v. Winter*, 648 A.2d 624, 627 (Vt. 1994)). The court in *Lipka* held that intent was not genuinely at issue in that case, a prosecution for sex offenses against a child, because the defendant did not claim accident or lack of criminal intent as a defense, but rather denied that the alleged contact occurred at all. *Id.* at 40.

¶ 52   The *Wilson* court did not decide between the two positions it acknowledged. The court did not say why it was abstaining, but evidently the court believed that it did not have to take a position. Immediately after citing *Lipka*, the court made these comments:

> "Defendant is mistaken that his intent was not at issue simply because he maintained that he had never actually touched the victims' breasts. Defendant's argument ignores the inferences that can be drawn from the testimony of the witnesses and the statements made by his counsel during opening and closing argument. Defendant testified that he liked to touch students. There was evidence presented that he was a 'touchy feely type person,' who often placed his hands on students. The victims' testimony indicated that defendant's sexual touching was subtle. Defendant himself testified that one of the victims 'misinterpreted' his actions in touching her breasts. The jury could have believed that defendant was either mistaken or lying about his touching of female students in a sexual manner. Apparently aware of this

- 11 -

possibility, defense counsel acknowledged that defendant is the kind of person that touches people, but even if there was contact with the victims, it was merely incidental contact and not for sexual arousal. Thus, defense counsel raised motive, intent and the possibility that any of the complained-of touching was inadvertent in such a way that the jury could acquit defendant even if it believed that he actually touched the victims' breasts. A defendant may not use ambiguity by denying commission of the act that comprises the offense, thereby seeking to bar other-crimes evidence, while at the same time leaving room to argue lack of intent to the jury. [Citation.] Under the circumstances presented here, we find that defendant's intent was a genuine issue in the case." *Wilson*, 214 Ill. 2d at 137-38.

Thus, the *Wilson* court determined that intent was at issue because the defendant made intent an issue. Evidently because the facts in the case met the criteria of both approaches—the alleged crime was a specific-intent crime *and* the defendant made intent an issue—the court felt that it was unnecessary to decide which approach to adopt and therefore decided to remain neutral.

¶ 53    While at least two of the three charged offenses in this case were specific-intent crimes, we hesitate to find that intent was at issue simply on that basis. The reason is that, as we examine *Deenadayalu*, we do not find that our decision suggested that "[i]n cases involving specific-intent crimes *** , intent is automatically at issue for purposes of deciding whether to admit other-crimes evidence, regardless of whether the defendant has made intent an issue in the case." *Id.* at 137. We also do not find any such suggestion in the cases on which we relied in *Deenadayalu*.

¶ 54    The defendant in *Deenadayalu* was charged with criminal sexual abuse and battery. The victim testified that the defendant touched her inappropriately during a medical exam. The court granted the State's motion to introduce the testimony of other patients who claimed that the defendant touched them inappropriately during exams. Upholding the admission of this other-acts evidence, we observed that "Illinois courts have held that other-crimes evidence is relevant in a sexual assault prosecution to prove the defendant's intent or lack of an innocent frame of mind." *Deenadayalu*, 331 Ill. App. 3d at 448. We cited three cases for this proposition: *People v. Luczak*, 306 Ill. App. 3d 319 (1999), *People v. Harris*, 297 Ill. App. 3d 1073 (1998), and *People v. Johnson*, 239 Ill. App. 3d 1064 (1992). In all three cases, the First District Appellate Court upheld the admission of other-acts evidence on intent. The court's holdings, however, were based not on whether the charged offenses were specific-intent crimes, but on whether the defendant made intent an issue.

¶ 55    In *Harris* and *Johnson*, the court upheld the admission of other-acts evidence because in each case the defendant admitted that he had sex with the victim but claimed that the sex was consensual. See *Harris*, 297 Ill. App. 3d at 1086 ("The defense suggests that N.G. consented to have sexual intercourse with defendant. Because this evidence of prior conduct tends to show that defendant did not act with an innocent intent, the trial court did not abuse its discretion in its admission."); *Johnson*, 239 Ill. App. 3d at 1075 ("Since defendant claims that complainant consented to his advances, it was appropriate *** to admit the prior crime evidence and allow the jury to determine if he acted with an innocent frame of mind.").

¶ 56    By contrast, in *Luczak*, the defendant did not admit to having sex with the victim, S.S., who testified that the defendant raped her in his car. The defendant did admit that S.S. accepted his offer of a ride on the night in question. The trial court allowed the State to present testimony

from another woman who claimed that the defendant offered her a ride and then raped her in his car. The appellate court affirmed, holding that the evidence of the prior assault was pertinent to the defendant's intent in offering S.S. a ride on the night in question:

> "Although defendant contended no sexual conduct occurred between him and S.S., he did claim that he and S.S. were together in his car. Defendant's testimony and S.S.'s testimony agreed that defendant offered her a ride, drove her to her house, and that they both left S.S.'s house in defendant's car. From there, the testimony substantially differed. S.S. testified that defendant drove to the southeast side of Chicago, threatened her, and eventually attacked her. Defendant, however, testified that he only possessed an intent to assist S.S. in purchasing cocaine and stated he briefly drove her to a friend's house and to a McDonald's restaurant. Clearly, defendant's intent was a central issue for the jury to decide. Therefore, evidence of defendant's prior crime was relevant to show defendant's intent at the time he was with the victim, specifically that defendant's intent was to sexually assault the victim.

> * * *

> In this case, defendant's intent for offering and giving S.S. a ride was in dispute. Defendant did not deny that S.S. was with him on the date of the alleged crime and at the place of the alleged crime, defendant's vehicle. Therefore, evidence of defendant's other crime was not only relevant to prove defendant's criminal intent to commit a forced sexual assault on S.S. but to show defendant's intent for seeking out the victim and being with the victim, a contested issue at trial." *Luczak*, 306 Ill. App. 3d at 325-26.

¶ 57    In *Deenadayalu*, 331 Ill. App. 3d at 448, after setting forth the facts and holdings of the foregoing three cases, we said:

> "In the present case, the trial court found that the evidence of the defendant's other acts of sexual misconduct was relevant to establish intent and the absence of mistake. On the basis of the principles outlined above, we cannot say that such a determination constituted an abuse of discretion."

Explaining this conclusion, we first noted the similarities between the abuse alleged by the victim and the abuse alleged by the other patients. *Id.* at 448-49. We followed those observations with these remarks:

> "Additionally, as in *Luczak*, the other-crimes evidence in this case [is] particularly relevant because the defendant denied that any sexual conduct occurred between him and the victim. The defendant testified that the victim mistook the nature and the location of his touching during the examination. The defendant also asserted that the victim mistook the wallet in his pocket for an erection. In light of the conflicting testimony between the victim and the defendant, intent and the absence of mistake were crucial issues for the trial court to decide." *Id.* at 449.

Thus, like the First District in *Luczak*, *Harris*, and *Johnson*, we looked to the nature of the defense to determine if intent was at issue.

¶ 58    We now return to the cases defendant cites: *Illgen*, *Hansen*, *Bobo*, and *Gibbs*. We begin with *Hansen* and *Gibbs* since they clearly provide no guidance on the present question.

¶ 59    In *Hansen*, the defendant was charged with the October 1955 murder of three teenage boys whose bodies were found naked in a forest preserve. The State presented witnesses who testified that the defendant told them that he picked up the boys while they were hitchhiking,

- 13 -

had sex with them at a horse stable, and killed them after they threatened to disclose the incident. The State introduced other-acts evidence that, from the 1950s through the 1970s, it was the defendant's practice to pick up young male hitchhikers and have sex with them. On appeal, the State suggested that the evidence was "relevant to the issues of motive and intent." *Hansen*, 313 Ill. App. 3d at 501. Specifically, the State contended that the defendant's practice of picking up young male hitchhikers for sex corroborated the witnesses' testimony that the defendant told them that his motive for killing the victims was to conceal his sexual activity with them. The appellate court rejected this claim of relevancy. *Id.* at 501-02.

¶ 60    *Hansen* is inapposite. We are concerned here with what makes intent an issue in a case. Apparently there was no question that intent was at issue in *Hansen.* The court addressed only whether the State's other-acts evidence was *relevant* to the issue of intent.

¶ 61    In *Gibbs*, the defendant was tried for aggravated battery involving a police officer. The officer testified that the defendant attempted to punch and kick him during a traffic stop. The officer partly blocked the blows. During the skirmish, the two fell to the ground. The defendant presented three witnesses who testified that the officer and the defendant fell to the ground because they both slipped on ice after the officer attempted to pull the defendant toward him. The trial court permitted the State to introduce evidence that the defendant was violent with another officer during a prior arrest. On appeal, the State defended the admission of the other-acts evidence, asserting that "the defense presented was that the incident resulted from an innocent frame of mind on the defendant's part and that given the conflicting evidence presented in the case, the defendant's intent became the controlling issue." *Gibbs*, 226 Ill. App. 3d at 1072. The appellate court disagreed that the defense presented was one of accident, and it held that the other-acts evidence was erroneously admitted. *Id.* at 1072-73.

¶ 62    *Gibbs* is of no help here because the court did not explain its conclusion that a defense of accident was not presented. The court might have believed that the testimony of the three witnesses, which concerned the mechanics of the fall itself, did not in strict terms constitute a defense to the officer's allegation of blows that *preceded* the fall. Since we can only speculate as to the court's reasons, *Gibbs* is not illuminating.

¶ 63    We turn to *Illgen* and *Bobo*. In *Illgen*, the defendant was charged with the intentional shooting death of his wife. The supreme court affirmed the trial court's admission of evidence that the defendant had abused the victim in the past. The court found that this other-acts evidence was relevant to intent, as the defendant claimed at trial that the shooting was accidental. *Illgen*, 145 Ill. 2d at 366.

¶ 64    In *Bobo*, the defendant, a high school teacher, was tried for sexually abusing a student. The victim testified that, when she went to the defendant's office on the day in question to get aspirin for a headache, the defendant touched her inappropriately. The trial court permitted the State to introduce "evidence of other wrongful acts, allegedly committed by defendant against several other female students, to show intent and/or motive and/or knowledge." *Bobo*, 278 Ill. App. 3d at 132-33. The appellate court held that this was error. The court explained that the defendant "denied that the entire incident with [the victim] ever occurred; he did not claim he accidentally touched her, nor did he give some other type of excuse." *Id.* at 133.

¶ 65    *Bobo*, we note, was distinguished by the court in *Luczak*. The defendant in *Luczak* argued that *Bobo* governed because, like the defendant in *Bobo*, he did not make an issue of his intent in having sexual contact with the victim but rather denied such contact altogether. The court in *Luczak* rejected the comparison. The critical difference, said the court, was that the defendant

in *Luczak* admitted that he was with the victim on the night in question, but the defendant in *Bobo* denied being with the victim when the alleged offense occurred. *Luczak*, 306 Ill. App. 3d at 325. The question of intent in *Luczak* was specifically about the defendant's intent in initiating his interaction with the victim. *Id.* at 325-26.

¶ 66 We can place into two groups the cases we have discussed in which the reviewing court found that the defense made intent an issue at trial: (1) cases in which the defendant admitted in some part to the acts underlying the offense (*the actus reus*) but denied that he had the requisite intent for the offense (*Illgen*, *Harris*, *Johnson*) and (2) cases in which the defendant did not admit to the acts underlying the offense but did admit at least that he was with the victim at the time in question and the evidence raised questions about the defendant's conduct and intent toward the victim during that time (*Wilson*, *Deenadayalu*, *Luczak*). Where the defense at trial involves no admissions or acknowledgements consistent with scenario (1) or (2), then the defense has not made intent an issue (*Bobo*).

¶ 67 The present case is closer to group (2) than group (1). The defense employed at trial was not analogous to the defenses employed in *Illgen*, *Harris*, and *Johnson*. That is, the defense was not that defendant masturbated in the nude in his doorway on the afternoon of July 19 but lacked the necessary criminal intent. Rather, defendant denied that he masturbated at all in his doorway on the afternoon of July 19 (thus defendant contradicted his statement to Mandat). Nonetheless, defendant made intent an issue at trial. He claimed that he took a bath on the afternoon of July 19 and, while wrapped in a towel from the waist down, went to shut the inner door. Defendant denied that he went to the front door in order to expose himself. In closing argument, defense counsel acknowledged that G.G.'s close-up photo of the house showed defendant behind the screen door, but counsel denied that it showed him masturbating. Thus, while the defense did not admit that defendant masturbated at his front door on the afternoon of July 19, the defense did admit that defendant was at his front door during that period and was photographed by G.G. Defendant's and G.G.'s conflicting accounts of what defendant did at his door raised a question of his intent in being at the door. Like the defendant in *Luczak*, defendant's testimony at trial placed him where the crime allegedly took place and disputed the State's theory as to the intent behind his presence.

¶ 68 We reject defendant's assertion that the other-acts evidence lacked probative value because, in offering it, the State simply assumed that defendant was aware that G.G. was outside—a point he consistently disputed not only at trial but also in his statement to Mandat. Without knowledge, defendant asserts, there can be no intent. Defendant's point lacks merit. The State offered independent evidence that defendant was aware that G.G. was outside. For instance, G.G. testified that defendant waved and called to her as she was walking across the street. Defendant cites no authority to suggest that the other-acts evidence had to pertain to both intent and knowledge.

¶ 69 Defendant's other objections to the other-acts evidence are specific to the particular facts of the prior acts. The State adduced evidence that, on May 18, 2010 (four years prior to the charged offenses), defendant approached C.K. at the public library and made sexually suggestive remarks to her after he was added to her MySpace account. After C.K. revealed that she was 14 years old, defendant continued with remarks of the same tenor, stating that C.K. was "sexy" and asking if she would be his "sexy girl." The State also introduced evidence that, on July 17, 2014 (two days before the charged incident), defendant followed G.G. and S.M. in his Jeep, waved at them, blew kisses at them, and later made a "humping" motion toward them.

- 15 -

¶ 70    Defendant claims that none of the incidents were similar enough to the charged incident. Other-acts evidence must "bear[ ] some threshold similarity to the crime charged." *Wilson*, 214 Ill. 2d at 136. However, except where the evidence is offered to show *modus operandi*, "mere general areas of similarity will be sufficient to allow the evidence to be admitted in such cases." *Id.* at 141.

¶ 71    As to the May 18, 2010, incident, defendant states:

"[C.K.] was a stranger; [G.G.] was a neighbor. [On May 18], [defendant] had been making small-talk; the present charges were devoid of conversation. [On May 18], the engagement was a computer chat with unwanted flirtation; the present allegations were nothing of the kind. [On May 18], [defendant] approached [C.K.] in a library; [G.G.] was the party who initiated the alleged encounter from across the street of [defendant's] home. Even the age of the minors was less a similarity than a happenstance, because [defendant's] awareness of [C.K.'s age] was disputed, in contrast to the current case, where [defendant] knew the youth of [G.G.] whom he simply never saw that day at all."

¶ 72    As to the July 17, 2014, incident, he states:

"[It] was not the same day. It was different conduct. It had a different manner; there was no [J]eep or [S.M.] on Saturday [July 19]. *** On these facts, blowing kisses on Thursday [July 17] showed nothing more than an inclination to blow kisses on Thursday. 'Intent' was a ruse to show an immoral propensity to be 'bad' on Thursday and Saturday alike."

¶ 73    Defendant's claims of dissimilarity are without merit. First, the incidents on July 17 and July 19 both involved G.G. Defendant futilely attempts to draw a distinction by noting that S.M. was with G.G. on July 17 but was absent on July 19. But defendant's conduct on July 19 confirmed his prurient interest in G.G., whether or not he was also interested in S.M. A defendant's prior conduct toward the victim can be relevant to intent and other proper considerations. See *Illgen*, 145 Ill. 2d at 366 (evidence of the defendant's prior abuse of the victim was relevant to whether he killed her intentionally); *People v. Kissinger*, 116 Ill. App. 3d 826, 831 (1983) (the defendant's harassment of the victim, who was Jewish, by sending him magazine subscriptions falsely addressed to a German war criminal and other German military figures was relevant to show the defendant's involvement in a scheme to fraudulently charge mailgrams to the victim). Defendant's unseemly gestures toward G.G. on July 17 made it more likely that his exposure of his penis in her presence on July 19 was intentional and not accidental.

¶ 74    Moreover, it is reasonable to infer, as did the trial court, that defendant's gestures on July 17 were directed toward S.M. as well as G.G. Defendant's conduct on July 17 and 19, together with his conduct toward C.K. in May 2010, manifested not only a prurient interest in female minors but a willingness to act on that interest in a brazen, persistent manner. In May 2010, he made sexual overtures to C.K. and continued them even after she told him her age. On July 17, defendant followed S.M. and G.G. in his Jeep and made suggestive gestures two separate times. On July 19, he escalated his deviance toward G.G. by masturbating in her presence. There was adequate similarity between the prior acts and the charged incident.

¶ 75    Defendant claims, however, that to base an inference regarding his conduct of July 19 on defendant's sexual interest in female minors is to rely inappropriately on propensity. First, as noted, the State's evidence did not show simply a general deviant interest in female minors. The State presented evidence that defendant expressed a prior interest *specifically* in G.G., the

victim of the charged offenses. As noted, prior acts toward the victim are relevant in their own right. See *Illgen*, 145 Ill. 2d at 366; *Kissinger*, 116 Ill. App. 3d at 831.

¶ 76    Moreover, evidence of defendant's general interest in female minors was proper as well. Defendant misunderstands the parameters on other-acts evidence. Certainly, the law does not permit the inference that because the defendant has committed *some* bad act or crime, he must have committed the charged offense. Just the same, the law does not shield a defendant from proof of his particular tendencies or patterns of conduct as they might bear logically on whether he acted in conformity with them in committing the charged offense. "The case law fully establishes that the State may adduce evidence of the defendant's proclivities or past conduct in order to prove intent or knowledge in the case *sub judice*." *People v. Gumila*, 2012 IL App (2d) 110761, ¶ 54 (the internal records in the defendant's computer showing prior visits to websites with child pornography were admissible as other-acts evidence to show that the defendant knowingly and voluntarily possessed images of child pornography found on his computer's hard drive). More specific to the present case, a defendant's prior conduct toward "the victim *or* persons in the same class of the victim" is admissible to show intent. (Emphasis added.) *Illgen*, 145 Ill. 2d at 367.

¶ 77    We note several cases illustrating this point. For example, in *People v. Patterson*, 2013 IL App (4th) 120287, ¶ 85, the defendant's acts of domestic abuse against prior girlfriends were held to be relevant to whether his current girlfriend's injuries were inflicted by him with intent to kill or instead were accidentally aggravated and ultimately fatal when he dragged her away after the assault.

¶ 78    In *People v. Dewey*, 42 Ill. 2d 148 (1969), the defendant was charged with the murder of an 11-year-old girl. The defendant admitted that he struck the victim with his car, but he claimed that the death was accidental. The supreme court upheld the admission of other-acts evidence that the defendant attempted to pick up girls of "the same age," ages 12 to 13, on prior occasions. *Id.* at 157. The court held that the evidence was relevant to whether the victim's death was accidental, as the defendant claimed. *Id.*

¶ 79    In *People v. Rachel*, 123 Ill. App. 3d 600 (1984), the defendant was tried for home invasion, battery, and indecent liberties with a child. The State presented testimony that four sisters, ages 8 through 16, were home alone when the defendant approached a bedroom window and asked two of the sisters if their mother was home. When the two sisters said that the mother was out, the defendant walked around the house, entered through the front door, and assaulted one of the other sisters who was sleeping on the living room couch. The defendant then fled. At trial, the defendant gave an innocent explanation for entering the home and denied that he assaulted anyone inside. *Id.* at 601-02. The State introduced evidence that, earlier on the evening of the charged offense, the defendant followed and approached two girls, both 13, who were walking near the victims' home. *Id.* at 605-06. The appellate court upheld the admission of the evidence, finding that the defendant's "conduct towards the first two young girls *** was probative of his intent and motivation when he entered the [victims'] home." *Id.* at 606.

¶ 80    Likewise, in the present case, defendant's prior unseemly demonstrations of a sexual interest in a particular class of victim, namely female minors, was probative as to whether he intended to expose his penis to G.G.

¶ 81    Defendant makes several other points, but they all fail. First, although it was, as defendant notes, "disputed" at trial whether he was aware when he made his advances toward C.K. that

she was 14 years old, the trial court believed C.K. over defendant on that question. We will not disturb that credibility determination. See *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App. 3d 452, 463-64 (1995) ("In a bench trial, as the finder of fact, the trial judge is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive."). Therefore, for purposes of judging the admissibility of the May 2010 incident, we take it as a fact that defendant continued his sexually charged remarks to C.K. after she disclosed that she was underage.

¶ 82    We also disagree that the May 2010 incident was too remote in time from the July 2014 charged conduct. The governing principles are as follows:

> "As a general rule, other offenses which are close in time to the charged offense will have more probative value than those which are remote. Nevertheless, the admissibility of other-crimes evidence should not, and indeed cannot, be controlled solely by the number of years that have elapsed between the prior offense and the crime charged. The decision whether to admit or exclude such evidence must be made on a case-by-case basis by the trial judge responsible for evaluating the probative value of the evidence." *Illgen*, 145 Ill. 2d at 370.

The probative value of the May 2010 incident was not lessened by the four-year gap. Admission of other-acts evidence of far greater remoteness has been upheld. See *id.* (16 years); *People v. Davis*, 260 Ill. App. 3d 176, 192 (1994) (20 years).

¶ 83    Also without merit is defendant's insinuation that his blowing of kisses at G.G. and S.M. was a capricious act that signaled no underlying sinister interest. Defendant fails to acknowledge that G.G. and S.M. testified that defendant later made a sexually suggestive "humping" motion toward them. If this did not of itself eliminate the possibility of an innocent explanation for the kiss-blowing, it certainly did in combination with the obscene display directed at G.G. on July 19. The similarity of defendant's conduct on July 17 to his conduct on July 19 was apparent on its face: his gestures on both days were various expressions of a prurient interest in G.G.

¶ 84    We reject, too, as bordering on the absurd, defendant's suggestion that G.G. "initiated the alleged encounter" on July 19 by walking on the sidewalk across the street from defendant's home. The evidence clearly showed defendant as the initiator or, more aptly, the provocateur, just as he had been with respect to C.K. While there are undeniable differences between the library incident and the charged occurrence, they do not obscure the critical fact that in both instances defendant manifested, through unwelcome conduct, a sexual interest in a 14-year-old girl.

¶ 85    Next, defendant claims that, even if the other-acts evidence was properly admitted, he is still entitled to relief because the State exceeded its boundaries in presenting and arguing the evidence. First, defendant claims that the State created a "trial within a trial" in presenting the other-acts evidence. See *People v. Robinson*, 167 Ill. 2d 53, 66-67 (1995) ("[A] trial court should carefully limit evidence of other crimes to that which is relevant for the purpose it was admitted. [Citation.] In this way, the trial court can limit prejudice to the defendant and prevent a 'mini-trial' on collateral issues."). Defendant submits that the State's presentation was excessive not only in terms of sheer volume (three witnesses—C.K., S.M., and Campise—in addition to G.G.) but also in detail. Second, defendant asserts that, in closing argument, the State used the other-acts evidence for the improper purposes of stressing defendant's

propensity to target 14-year-old girls and bolstering G.G.'s credibility. See *People v. Thingvold*, 145 Ill. 2d 441, 459 (1991) ("[E]vidence of other crimes is not admissible to bolster the credibility of a prosecution witness.").

¶ 86 Defendant procedurally defaulted these claims by failing to raise them in a timely fashion, if it all, below. Defendant's objection to the admission of the other-acts evidence did not relieve him of the responsibility of *further* objecting when he believed that the State was making improper use of the evidence. See *Robinson*, 167 Ill. 2d at 66-67 (the defendant, who had objected to the admission of other-acts evidence, forfeited his objection that the State created a "mini-trial"). Defendant does not identify any objection, during the State's presentation of the other-acts evidence, that the State was creating a mini-trial. We note that defendant did object, during the State's cross-examination of defendant, that the State was belaboring the May 2010 incident, and the court sustained the objection. By that time in the trial, however, the court had already received the testimony of the State's witnesses as to the prior acts. Defendant also fails to identify, and our review of the record has not disclosed, any objection that the State was making improper use of the other-acts evidence in closing argument. "A defendant is not entitled to review of a claimed error unless he has made a timely objection at trial and raised the issue in a posttrial motion." *People v. Leach*, 2012 IL 111534, ¶ 60 (citing *People v. Enoch*, 122 Ill. 2d 176, 186 (1988)).

¶ 87 Defendant does not ask us to review his contentions under the plain-error doctrine, which provides a limited avenue for reaching an otherwise forfeited claim. See *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The defendant has the burden of establishing that the doctrine applies, but when, as here, he fails even to invoke the doctrine, he obviously has failed to meet his burden. *Id.* at 545-46. Consequently, the forfeiture stands.

¶ 88 For the foregoing reasons, we hold that the trial court did not abuse its discretion in admitting the other-acts evidence.

¶ 89 B. Sufficiency of the Evidence

¶ 90 Defendant challenges the sufficiency of the State's evidence. When considering such a challenge, the function of the reviewing court is not to retry the defendant. *People v. Lloyd*, 2013 IL 113510, ¶ 42. Viewing the evidence in the light most favorable to the prosecution, we determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Id.* We allow all reasonable inferences from the record in favor of the prosecution. *Id.* " 'We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt.' " *Id.* (quoting *People v. Collins*, 214 Ill. 2d 206, 217 (2005)).

¶ 91 Defendant makes several points. First, he contends that the close-up photograph of him behind the screen door does not depict him as totally naked. He claims that the solid portion of the door blocks his body from the waist down, undermining G.G.'s claim that she could tell he was totally naked behind the door. Thus, according to defendant, the photo is not inconsistent with his testimony that, following his bath on the afternoon of July 19, he placed a towel around his waist and went to the front of the house in order to close the inner door.

¶ 92 The trial court, however, found that the photo, though "not specifically clear," shows a "total[ly] naked man." Thus, the court found that the photo supported not only G.G.'s account that defendant deliberately exposed himself to her at the front door but also defendant's

admission to Mandat that he went to the front door while entirely naked and masturbating, albeit without the intent to expose himself to another.

¶ 93 We review the photograph *de novo*, without deference to the trial court's interpretation. See *People v. Lamborn*, 185 Ill. 2d 585, 590 (1999). The photo is grainy. Defendant appears as a silhouette of a head and a torso. His individual features are not discernible. The silhouette is flesh-colored, indicating that defendant's torso is bare. The screened portion of the door extends below defendant's waist—or at least where we gather his waist would be. The flesh color shades off into darkness at or just below where defendant's waist would be; whether this is from shadow or a covering (such as a towel) is unclear. Thus, we are unable to tell from the picture whether defendant is naked from the waist down.

¶ 94 The State, however, never claimed that the photo was an exact representation of what G.G. claimed to have seen with her naked eye: defendant fully nude and masturbating behind the screen door. The photo corroborates G.G.'s testimony that defendant was behind the screen door and was nude at least down to the waist. While the photo does not confirm her claim that defendant was also naked below the waist, neither does it disconfirm it, due to the poor resolution of the image.

¶ 95 Moreover, the photo was purported to memorialize only part of G.G.'s observations. She testified that she observed defendant not only when he was behind the screen door but also when he opened the door and thrust his penis through the doorway. "A conviction may be upheld based on the positive and credible testimony of a single witness, even if this testimony is contradicted by the defendant." *Deenadayalu*, 331 Ill. App. 3d at 450. Although defendant's trial testimony substantially contradicted G.G.'s account, his statement to Mandat aligned with her account in that he admitted that he went to the front door to check the mail while fully nude and masturbating. At trial, defendant disavowed this admission. The court specifically found defendant's admission to be credible (and supportive of G.G.'s testimony) and rejected defendant's testimony that he was merely discussing a *hypothetical* masturbation scenario posed by Mandat. The court, as the finder of fact, was in a superior position to judge the credibility of the witnesses and resolve conflicts in their testimony (*People v. Vaughn*, 2011 IL App (1st) 092834, ¶ 24), and we will not substitute our judgment on such matters (*People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009)). There is sufficient evidence in the record, apart from G.G.'s photographs, from which the trial court could find that defendant was naked and masturbating at his front door and also that he opened the door and thrust his penis through the doorway.

¶ 96 Specific to the disorderly conduct conviction, defendant contends that, even accepting that he exposed his penis and masturbated at his front door as G.G. described, he was not guilty of disorderly conduct because "[a]n act of sexual indiscretion is not *per se* a breach of the peace." Defendant claims to derive this principle from *City of Chicago v. Murray*, 333 Ill. App. 233 (1947), where the defendant, a married woman, was charged under a city ordinance with disorderly conduct for having sex with her paramour in a hotel room. When her husband entered the room and observed the sexual act, he shot the paramour. The defendant was convicted, but the appellate court reversed. The court noted that, although the defendant's conduct was contrary to public morals, it did not tend to create a breach of the peace, an element under the ordinance, because "[o]nly the parties immediately concerned were disturbed thereby." *Id.* at 237.

¶ 97    *Murray* is distinguishable. "Disorderly conduct is loosely defined. As a highly fact-specific inquiry, it 'embraces a wide variety of conduct serving to destroy or menace the public order and tranquility.' " *People v. McLennon*, 2011 IL App (2d) 091299, ¶ 30 (quoting *In re B.C.*, 176 Ill. 2d 536, 552 (1997)). Conduct need not occur in public in order to constitute a breach of the peace. *Id.* ¶ 31; see also *People v. Davis*, 82 Ill. 2d 534, 538 (1980) ("A breach of the peace may as easily occur between two persons fighting in a deserted alleyway as it can on a crowded public street."). Context controls, however (*McLennon*, 2011 IL App (2d) 091299, ¶ 31), and logically, acts performed in public are more likely to disturb the public order. What sets this case apart from *Murray* is that, according to G.G., defendant deliberately positioned himself so that his nakedness and act of masturbation were visible to her and, necessarily, to other passersby. The evidence supports the court's finding that defendant committed a breach of the peace.

¶ 98    We next address defendant's specific challenges to the evidence supporting his conviction of sexual exploitation of a child. That offense, as charged by the State, occurs when a person "in the presence *** of a child, and with knowledge that a child *** would view [his] acts, *** exposes [his] sex organs *** for the purpose of sexual arousal or gratification of such person or the child." 720 ILCS 5/11-9.1(a)(2) (West 2014). Defendant focuses his challenge on the "presence" and "knowledge" elements of the offense.

¶ 99    Defendant asserts that, as a matter of law, G.G. was not in his "presence" when she was across the street from his house, from which vantage point she claimed to have seen him naked and masturbating. We note that, at trial, the State did not introduce evidence of the distance between defendant's front door and the sidewalk across the street. Defendant attached to his posttrial motion an affidavit from his father, Thomas Fretch (Fretch), who averred that he measured the distance as 80 feet. The State has not disputed the accuracy of this figure, and we accept it for purposes of defendant's argument. Defendant contends that, "[u]nder the law, the element of 'presence' connotes an occupation of the same space" and that, when G.G. was across the street, she was not within the "same space" as defendant. We review *de novo* a question about the meaning of a statutory term. *People v. Campa*, 217 Ill. 2d 243, 252 (2005).

¶ 100    For his suggestion that "presence" means "occupation of the same space," defendant cites five cases and a dictionary definition. Two cases, *People v. Ricky E.T.*, 405 Ill. App. 3d 98 (2010), and *In re Donald R.*, 343 Ill. App. 3d 237 (2003), involved prosecutions for sexual exploitation of a child, but in neither case was the element of "presence" at issue or discussed. Therefore, they provide no guidance. Another case, *People v. Bergeson*, 255 Ill. App. 3d 601 (1994), involved a challenge to a conviction of disorderly conduct. The challenge focused on whether the defendant knowingly acted unreasonably in looking at the victim's window from 10 feet away outside. Defendant's parenthetical reference to the holding in *Bergeson* reads: "wherein a distance of ten-twelve feet separated by a sidewalk and a residential window was not presence." Defendant misrepresents the holding in the case. Presence was not an issue in *Bergeson*, nor was presence or a comparable concept an element of the offense of disorderly conduct. See Ill. Rev. Stat. 1991, ch. 38, ¶ 26-1(a)(1).

¶ 101    The remaining two cases, *People v. Robinson*, 383 Ill. App. 3d 1065 (2008), and *People v. Ortiz*, 156 Ill. App. 3d 170 (1987), address, respectively, the element of "immediate presence" in the vehicular-hijacking statute (720 ILCS 5/18-3(a) (West 2004)) and the element of "presence" in the robbery statute (Ill. Rev. Stat. 1985, ch. 38, ¶ 18-1).

¶ 102    In *Ortiz*, the defendant appealed his conviction of armed robbery. The evidence showed that, while the victim was in an upstairs bedroom of his mother's home, the defendant and his companion entered the house and took jewelry from the victim's mother's first-floor bedroom. When the victim went downstairs, the intruders threatened him with a gun and then fled. On appeal, the defendant argued that he did not take the jewelry from the "presence" of the victim, because the victim was upstairs when the items were taken from the first floor. See *id.* (robbery is the taking of "property from the person or presence of another by the use of force or by threatening the imminent use of force"). In rejecting this argument, the appellate court applied case law holding that a taking occurs in the "presence" of the victim when " 'the victim's proximity or control over the property was so close that he could have prevented the taking if he had not been subjected to force or the threat of force by the robber.' " *Ortiz*, 156 Ill. App. 3d at 175 (quoting *People v. Carpenter*, 95 Ill. App. 3d 722, 726 (1981)). The court stressed that presence does not mean "immediate presence." *Id.* The court held that, though the victim was upstairs, the jewelry could be considered within his care and control and, therefore, in his "presence." *Id.*

¶ 103    In *Robinson*, the defendant appealed his conviction of vehicular hijacking, arguing that the State failed to prove that he took the victim's vehicle from her "immediate presence." See 720 ILCS 5/18-3(a) (West 2004) ("A person commits vehicular hijacking when he or she takes a motor vehicle from the person or immediate presence of another by the use of force or by threatening the imminent use of force."). The victim testified that the defendant approached her on the street and struck her as he tried to get her car keys. After another person intervened, the victim began walking to a relative's house to phone the police. As she was en route, she observed the defendant driving her car away. She was three houses away from her car at the time of the attack. *Robinson*, 383 Ill. App. 3d at 1066-67.

¶ 104    In addressing the defendant's contention, the appellate court noted several definitions of "immediate presence" in the case law. One court held that the motor vehicle must be "near at hand" to the victim (internal quotation marks omitted) (*In re Ricardo A.*, 356 Ill. App. 3d 980, 992 (2005) (element met when victim was 5 to 10 feet from the car)); another that the victim must be in the "immediate vicinity of the car" (*People v. Cooksey*, 309 Ill. App. 3d 839, 848 (1999) (element not met when the victim was not less than 25 feet from the car)); and another that the car must be in the "immediate control" of the victim (*People v. McGee*, 326 Ill. App. 3d 165, 170 (2001) (element not met when the victim was inside a house)). The *Robinson* court held that the State's evidence did not meet any of these definitions of "immediate presence." The State's specific failure was that, while it presented evidence of how far the victim was from her car at the time of the physical assault, it presented no evidence of how far she was from the car when the defendant later seized it. *Robinson*, 383 Ill. App. 3d at 1070-71.

¶ 105    *Ortiz* and *Robinson* are not helpful here. The statutory element at issue in *Robinson* was "*immediate* presence," and the court provided no definition of "presence" itself. The definition of "presence" applied in *Ortiz* was relative not to the perpetrator's distance from the victim, but to the victim's distance from the object taken. The definition contained concepts such as "control" and "ability to prevent" that have no obvious analogue in the element of "presence" in the offense of sexual exploitation of a child.

¶ 106    Defendant also cites the following definition of "presence" from Black's Law Dictionary:
    "Act, fact, or state of being in a certain place and not elsewhere, or within sight or call, at hand, or in some place that is being thought of. [Citation.] [T]he existence of a

person in a particular place at a given time particularly with reference to some act done there and then. Besides actual presence, the law recognizes *constructive* presence, which latter may be predicated of a person who, though not on the very spot, was near enough to be accounted present by the law, or who was actively co-operating with another who was actually present. [Citation.]" (Emphasis in original.) Black's Law Dictionary 1346 (4th ed. 1968).

¶ 107    Even if this generalized definition were support for defendant's suggestion that "presence" means "occupation of the same space," the definition does not, obviously, limit "same space" to any particular physical span. Notably, the offense of sexual exploitation of a child requires "presence" *or* "virtual presence," *i.e.*, a video-facilitated presence. 720 ILCS 5/11-9.1(a), (a-5) (West 2014). This suggests openness in the concept of "presence." Even at an 80-foot distance, G.G. could perceive and be impacted by defendant's actions. We hold that the "presence" element was satisfied here.

¶ 108    Defendant also contends that the State failed to prove that defendant exposed his penis knowing that G.G. would view him. Here we grant defendant's motion for leave to cite, as additional authority, *People v. Nash*, 282 Ill. App. 3d 982, 986 (1996) (citing 720 ILCS 5/4-5 (West 1992)), which holds that "knowledge" as an element of a crime means conscious awareness.

¶ 109    According to defendant, G.G.'s testimony is consistent with her coming across defendant as he was already masturbating, "in a place he had a right to be, with a right to expect that no one would be paying attention much less watching." We disagree. G.G. described the three passes she made in front of defendant's house as she walked on the opposite sidewalk. The first time, she saw defendant outside the front door, smoking. The second time, she saw him behind the screen door, removing his clothes. They made eye contact. The third time, defendant called "Hey" to G.G. She looked and saw that defendant was naked and masturbating just behind the screen door. They made eye contact again. He waved as if to invite her inside. When she left and returned with a camera phone with storage, he opened the door and thrust his penis through the doorway. This evidence suggests not that G.G. happened upon defendant as he was masturbating innocently inside his home, oblivious to her presence, but rather that her presence was the reason he stripped naked and masturbated. The other-acts evidence that defendant made sexually suggestive remarks and gestures to female minors, including G.G. herself, supports G.G.'s testimony that defendant's exposing himself to her was deliberate.

¶ 110    Defendant suggests that the "Hey" that G.G. claimed to hear from defendant was "not a yell but an utterance overheard when he was already indisposed under circumstances of never expecting her." It was, he claims, a "grunted meaningless syllable" during his sex act. Defendant has no basis in the record for suggesting this. G.G. was unequivocal in describing the utterance as intelligible and as designed to get her attention.

¶ 111    Defendant also asserts that G.G. implausibly claimed that defendant waved to her with the same hand with which he was masturbating. Defendant misreads the record. G.G. testified that defendant masturbated with his left hand and waved with his right.

¶ 112    Defendant likens this case factually to *Bergeson,* where the State's proof on the knowledge element of the defendant's disorderly conduct charge was found insufficient. The defendant was charged with knowingly looking into the victim's window in such an unreasonable manner as to alarm and disturb the victim. At trial, the victim testified that she was in her first-story apartment bedroom at about 1:20 a.m. when she heard crunching noises outside,

which sounded like someone walking on the gravel strip surrounding the apartment building. Several seconds later, the light coming through the crack left by her window coverings was blocked. She got up and observed the defendant about 10 feet from her window. He was pacing back and forth and looking up at a second-story window. The victim testified that the defendant also appeared to be looking in her window, but she admitted that she did not actually see him look down at her window. She recognized the defendant as another resident of the apartment complex. *Bergeson*, 255 Ill. App. 3d at 602-03.

¶ 113    The appellate court reversed the defendant's conviction. On the knowledge element, the court said:

"[T]he statute requires that the defendant act knowingly, and there is no evidence that defendant knew who lived in the apartment. Although defendant presumably knew approximately what time it was, there is no evidence that he was aware that the window he was near looked into the apartment's bedroom, or even that he knew anyone was at home. In the absence of such knowledge, defendant could not have knowingly acted unreasonably." *Id.* at 605.

¶ 114    Defendant suggests that his behavior "was equally unknowing, where the complainant was even farther away, and where [defendant] had not wandered away from home." We disagree. As noted, G.G. testified to a series of events from which the trial court could reasonably infer that defendant saw G.G. and decided to undress and expose his penis to her. While masturbating, he got her attention and beckoned her inside. There was no comparable evidence in *Bergeson* on the element of knowledge.

¶ 115    For these reasons, we uphold defendant's convictions of disorderly conduct and sexual exploitation of a child.

¶ 116                    C. Ineffective Assistance of Trial Counsel

¶ 117    Defendant filed a posttrial motion alleging several grounds of ineffective assistance of trial counsel.

¶ 118                    1. General Principles

¶ 119    Both the United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. Claims of ineffectiveness are judged under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To prevail on a claim of ineffectiveness, a defendant must demonstrate (1) that counsel's performance fell below an objective standard of reasonableness and (2) a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 694; *People v. Ramsey*, 239 Ill. 2d 342, 433 (2010). Counsel's performance is assessed against an objective standard of competence under prevailing professional norms. *Ramsey*, 239 Ill. 2d at 433. To establish deficient performance, the defendant must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy. *Id.* As a result, counsel's strategic choices made after investigation of the law and facts are virtually unassailable. *Id.* The failure to satisfy either prong of *Strickland* defeats an ineffectiveness claim. *People v. Patterson*, 217

Ill. 2d 407, 438 (2005).

¶ 120                    2. Trial Counsel's Agreement to Partial Closure of the Courtroom

¶ 121        Defendant contends that his counsel was ineffective for agreeing to the exclusion, during G.G.'s and S.M.'s testimony, of all spectators except the parents of G.G. and S.M. Defendant claims that the exclusion violated his right to a public trial, which is guaranteed by the United States and Illinois Constitutions (U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8).

¶ 122        The State claims that defendant forfeited this contention by failing to raise it in his posttrial motion. The State appears to mean that defendant did not raise *ineffectiveness* with regard to the closure, because defendant did assert in the motion that the closure violated his "constitutional and statutory rights to a public trial." While defendant did not raise the issue below in precisely the same way he frames it on appeal, we hold that what he did raise was enough to preserve the issue for review. Therefore, we reject the State's claim of forfeiture and consider the merits of the issue.

¶ 123        Defendant acknowledges the threshold issue of whether he is bound by his counsel's waiver, on the record, of the right to a public trial. Defendant was present in court with his counsel when the State informed the trial court that the parties had a signed stipulation regarding closure of the courtroom. The State read the stipulation on the record. The stipulation stated that, during G.G.'s and S.M.'s testimony, the courtroom would be closed to all spectators except the parents of G.G. and S.M. The trial court asked defense counsel if the defense was so stipulating, and counsel said yes. The court neither made inquiries of defendant nor asked counsel if he had consulted with defendant regarding the stipulation. Defendant voiced no objection during the presentation of the stipulation. The record contains the written stipulation, which is signed by the assistant State's Attorney and defense counsel but not by defendant himself.

¶ 124        Defendant asserts that a criminal defendant cannot be deemed to have waived the right to a public trial by remaining silent during his counsel's waiver of the right. According to defendant, "[a] defendant must affirmatively state on the record his agreement to the surrender of his constitutional right" and display "an in-court understanding of the stakes *** before a court may close the courtroom."

¶ 125        For this position, defendant cites the decision of the Seventh Circuit Court of Appeals in *Walton v. Briley*, 361 F.3d 431 (7th Cir. 2004). In *Walton*, the defendant brought federal *habeas corpus* litigation, claiming that his right to a public trial was violated when, on two separate dates, the district court conducted his trial after business hours, when the courthouse was closed to the public. Defense counsel did not object to the resulting closure of the courtroom but also did not affirmatively agree to it. In fact, the closure apparently was not mentioned on the record at all. The district court hearing the *habeas* petition held that, because the defendant's counsel did not object to the closure, the defendant's claim of error was waived. *Id.* at 433. The Seventh Circuit disagreed. The court held that the right to a public trial is a "fundamental trial right[ ]" (*id.* at 434) subject to the same "heightened standard of waiver" applicable to "plea agreements, the right against self-incrimination, the right to a trial, the right to a trial by jury, the right to an attorney, and the right to confront witnesses" (*id.* at 433). As with those other rights, the "presumption of waiver from a silent record is impermissible." *Id.* at 434. Rather, the "right to a public trial may be relinquished only upon a showing that the defendant knowingly and voluntarily waived such a right." *Id.* The court held that counsel's

failure to object to the closure of the courtroom was not an effective waiver of the right to a public trial because there was no indication in the record that the defendant knowingly and voluntarily relinquished the right. *Id.*

¶ 126    Decisions of federal courts, aside from those of the United States Supreme Court, are not binding on this court but are merely persuasive authority. *People v. Jenk*, 2016 IL App (1st) 143177, ¶ 26. We further note that, unlike in *Walton*, there was no "silent record" here. Rather, the parties stipulated in defendant's presence to a partial closure of the courtroom. We acknowledge that some of the language in *Walton* might be construed as suggesting that the right to a public trial cannot be waived by counsel but must be waived by the defendant personally. The United States Supreme Court has not ruled on whether the right to a public trial must be waived personally by the defendant. See *Bowers v. Michigan*, No. 1:13-CV-696, 2016 WL 4571400, at *10 (W.D. Mich. Aug. 31, 2016) (noting that the Supreme Court has not decided whether "an attorney cannot waive his client's right to a public trial"). To the extent that *Walton* holds that a personal waiver is required, it does not represent the position of all federal circuit courts. See *United States v. Sorrentino*, 175 F.2d 721, 723 (3d Cir. 1949) (personal waiver not required).

¶ 127    Defendant cites no authority besides *Walton* on whether the right to a public trial may be waived by counsel. We note that our supreme court has identified only five decisions that belong ultimately to the defendant: (1) what plea to enter; (2) whether to waive a jury trial; (3) whether the defendant will testify on his own behalf; (4) whether to submit an instruction on a lesser included offense; and (5) whether to appeal. *People v. Clendenin*, 238 Ill. 2d 302, 318 (2010). "[A]part from these decisions ***, trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client." *Id.* at 319. Here, defendant made no allegation in his posttrial motion that counsel failed to consult with him before stipulating to the partial closure of the courtroom during the testimony of G.G. and S.M.

¶ 128    Moreover, defendant voiced no objection when counsel agreed on the record to the closure. In *People v. Webb*, 267 Ill. App. 3d 954, 958-59 (1994), the appellate court held that the defendant barred himself from claiming a violation of the right to a public trial when he failed to object to his counsel's waiver, in open court, of that right. We recognize that here defendant claims that counsel's waiver constituted ineffectiveness, a contention not specifically made in *Webb*. This distinction makes a difference, however, only if defendant's silence in this case cannot be deemed acquiescence in counsel's waiver. Defendant cites no authority aside from *Walton* to suggest that a defendant cannot acquiesce by silence in his counsel's implied (or, as here, express) waiver of the defendant's right to a public trial. We hold that defendant, having remained silent when the parties stipulated to the partial closure of the courtroom, cannot now disavow responsibility for that waiver and lay the fault on counsel by claiming ineffectiveness. See *People v. Cleveland*, 2012 IL App (1st) 101631, ¶¶ 66-67 (defendant could not claim ineffectiveness with respect to counsel's decision not to call him to testify, where defendant never expressed to the court during the trial his desire to testify and therefore acquiesced in counsel's decision).

¶ 129    For these reasons, we reject defendant's claim of ineffectiveness over the partial closure of the courtroom.

¶ 130                    3. Trial Counsel's Failure to Introduce Work Records at Trial

¶ 131       Defendant asserted in his posttrial motion that trial counsel "failed to present an alibi defense to the collateral crime, which shows that the defendant was at work" on the day that, according to G.G. and S.M., defendant followed them in his Jeep and made lewd gestures toward them. Defendant submitted with his motion two documents that purported to be work logs from defendant's employer, Advance Refrigeration in Bensenville, related to defendant's work activities on July 17, 2014. One document, a "Daily Route Sheet," reflects that defendant was out for deliveries on July 17 until 4 p.m. The other document reflects that defendant was "in" at 7:15 a.m. and "out" at 4:15 p.m. on July 17. Defendant claims that this documentation, combined with his trial testimony that he drove a GMC truck while doing work deliveries, would have undercut G.G.'s and S.M.'s testimony that they saw him in a *black Jeep* in the early to mid-afternoon on July 17.

¶ 132       The trial court denied this ineffectiveness claim, apparently because the court believed that defendant's posttrial motion was fatally vague on the issue since it did not specify the prior act for which defendant claimed to have alibi evidence. It seems to us, however, that posttrial counsel's remarks at the hearing on the motion clarified which prior act defendant had in mind. In any case, defendant's contention on appeal is forfeited for lack of development. Defendant's argument on this issue focuses on the prejudicial impact of trial counsel's omission. On the performance prong of *Strickland*, defendant offers only the bare assertion that "[c]ounsel's failure to obtain the exculpatory time-sheets f[ell] below an objective standard of reasonableness." A point consisting of such a conclusory statement is forfeited on appeal for lack of development. See *Pilat v. Loizzo*, 359 Ill. App. 3d 1062, 1063 (2005) ("[T]he appellant must argue the points that he or she raises, or they are waived," and "[a] mere conclusory assertion, without supporting analysis, is not enough."); see also Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016) ("Points not argued are waived ***.").

¶ 133       Moreover, there is a sufficient independent basis in the record for affirming the denial of this claim. See *People v. Mujica*, 2016 IL App (2d) 140435, ¶ 13 (reviewing court may affirm on any basis apparent in the record). Defendant had the burden of pleading and proving his claim of ineffectiveness. See *People v. Lundy*, 334 Ill. App. 3d 819, 833 (2002) ("It is defendant's burden to demonstrate that he has received ineffective assistance of counsel."). He had to overcome the presumption that trial counsel had good reasons for his decisions on matters of tactics or strategy. *United States v. Lindsay*, 157 F.3d 532, 535 (7th Cir. 1998). Defense counsel has a duty to investigate possible defenses and present exculpatory evidence but only those defenses and evidence of which counsel is or reasonably should be aware. See *People v. Domagala*, 2013 IL 113688, ¶ 38; *People v. Wilson*, 191 Ill. 2d 363, 377 (2000) (trial court properly dismissed, without a hearing, defendant's postconviction claim alleging ineffective assistance for counsel's failure to present a certain witness in mitigation because defendant failed to allege why counsel would have reason to know of the witness's existence); *People v. Humphries*, 257 Ill. App. 3d 1034, 1043 (1994) ("An attorney cannot be said to be ineffective for failing to call a witness whose identity and potential testimony are, through no fault of the attorney, unknown to him or her." The trial court did not err in dismissing defendant's posttrial motion alleging that counsel was ineffective for failing to call witness who allegedly would have supported defense of compulsion, as defendant failed to allege that counsel knew or should have known of the witness's existence.). Defendant did not allege in his motion that trial counsel knew or should have known of the work records. Defendant did

not present any affidavit from trial counsel as to why counsel did not introduce the work records at trial, nor did defendant present testimony on the subject. These are critical failures. We find no error in the denial of this ineffectiveness claim.

¶ 134    4. Trial Counsel's Failure to Challenge G.G.'s Observations of Defendant on July 19

¶ 135    Defendant asserts that trial counsel was ineffective for failing to challenge G.G.'s ability to observe details about defendant that were critical to her testimony about the incident on July 19. According to defendant, counsel's performance was deficient in two respects. First, counsel failed to challenge G.G.'s testimony by introducing photographs Fretch took of their home—particularly, the front screen door—that would have undermined G.G.'s claimed observations. Second, even apart from the failure to use these photographs, counsel failed altogether to challenge G.G.'s ability to observe defendant from her vantage point across the street.

¶ 136    The latter part of the ineffectiveness claim is forfeited. In his posttrial motion, defendant (represented by new counsel) alleged that trial counsel "failed to present photographs that are material and exculpatory." Defendant did not identify any other manner in which counsel failed to challenge G.G.'s observations. Accordingly, we address only the specific claim that counsel failed to use the photographs; the rest of defendant's challenge is procedurally barred. See *People v. Ramos*, 339 Ill. App. 3d 891, 899-900 (2003) (finding forfeiture of part of ineffectiveness claim for failure to raise it below). Also, defendant does not ask us to review the contention under the plain-error doctrine. See *Hillier*, 237 Ill. 2d at 545.

¶ 137    We move to the preserved claim of ineffectiveness. Defendant submitted with his posttrial motion an affidavit from Fretch and 10 photographs of the house. Fretch averred that he took the photographs and that they were true and accurate depictions of the house at the time of the alleged offenses. Fretch noted that two of the photographs show the front of the house as seen from the opposite sidewalk. Fretch asserted that he measured the distance from the front door to the opposite sidewalk as 80 feet. Defendant appears in several of the photographs, presumably to demonstrate what could be seen of him from the various distances and perspectives. Fretch averred that, at the time of trial, he "broached with [defendant's] former attorney the topic of presenting these or comparable photographs." Trial counsel decided not to introduce the photographs at trial, in order to avoid "tarnish[ing] the reputation and/or credibility of the complaining witness."

¶ 138    The trial court denied the ineffectiveness claim, finding that the submitted photographs were cumulative and not exculpatory. As the court had also presided over the bench trial, it was "uniquely" positioned to determine whether counsel's failure to introduce the photographs prejudiced defendant; therefore, its conclusion is entitled to "substantial deference." *People v. Scott*, 194 Ill. 2d 268, 275-76 (2000) (the judge who decided postconviction claim of ineffectiveness regarding counsel's performance at sentencing, and who concluded that the prejudice prong of *Strickland* was not met, was the same judge who had presided over defendant's trial and sentencing); see also *People v. Kluppelberg*, 257 Ill. App. 3d 516, 528 (1993) ("Since this was a bench trial, the same judge who heard all of the evidence in the role of fact finder and who found defendant guilty also heard the additional evidence presented at the post-trial hearing [on the defendant's ineffectiveness claim]. The trial judge was thus in a unique position to evaluate all of the evidence and make a determination as to the effect of the new evidence.").

¶ 139    We see no basis for upsetting the court's determination that trial counsel's use of the photos would not have changed the outcome at trial. Two of the photos are close-ups of the front door. The photos are clearer than G.G.'s photos. In one photo, defendant is standing in the doorway holding open the screen door. His torso is bare and he is wearing a towel around his waist. In the second photo, defendant is standing behind the screen door. Defendant's features are more defined than in G.G.'s close-up photo; we can see that the solid portion of the door clearly obscures his lower body from just slightly below his waist (defendant's genitals would not have been visible). We presume, as apparently the trial court did, that the photos accurately portray both the house and defendant as G.G. would have been able to observe him behind the screen door on the afternoon of July 19.

¶ 140    Even so presuming, we are not prepared to gainsay the trial court's denial of defendant's claim that the photos would have changed the outcome at trial. G.G. testified that she observed defendant not only when he was behind the screen door but also when he opened the door and thrust his penis through the doorway. The State introduced no corroborating proof of the latter act, but "[a] conviction may be upheld based on the positive and credible testimony of a single witness, even if this testimony is contradicted by the defendant." *Deenadayalu*, 331 Ill. App. 3d at 450. In convicting defendant, the trial court specifically found G.G. credible, and the court implicitly reaffirmed that finding in denying the ineffectiveness claim. We will not upset that finding.

¶ 141    The second set of photos purports to depict defendant's home from across the street. Defendant appears to be standing behind the screen door in at least one of these photos. Defendant claims that these photos are not cumulative of the two photos that were taken by G.G. and introduced by the State because, contrary to G.G.'s claim, her photos were not actually taken from across the street. We are not in a position to evaluate this assertion, but we do note that defendant's home appears smaller in defendant's photos than even in G.G.'s un-zoomed photo of the home. However, even assuming that defendant's photos are the more accurate depiction of the home from where G.G. claimed she stood, we would uphold the trial court's finding of no reasonable probability of a different outcome at trial. Regardless of how the distance and/or the configuration of the screen door would have impacted G.G.'s ability to perceive defendant when the door was shut, those factors would not have prevented G.G. from perceiving defendant as naked when he opened the screen door. Consequently, we uphold the trial court's denial of this claim of ineffectiveness.

¶ 142                              D. Defendant's Sentence

¶ 143    Defendant's final contention on appeal is that the sentence imposed on his conviction of sexual exploitation of a child, a Class A misdemeanor, was unauthorized. The trial court sentenced defendant to 360 days of imprisonment with a consecutive two-year term of probation. As defendant construes the governing statute, section 5-6-2(f) of the Unified Code of Corrections (Code) (730 ILCS 5/5-6-2(f) (West 2014)), a combination of imprisonment and probation for an individual offense must not in the aggregate exceed the maximum term of imprisonment authorized for the offense, which, for a Class A misdemeanor, is 364 days. See 730 ILCS 5/5-4.5-55(a) (West 2014). According to defendant, then, the court had no authority to impose a combined term of imprisonment and probation in excess of 364 days, and consequently the two-year term of probation is invalid. We disagree. In our view, section 5-6-2(f) requires only that the prison and probation components of a combined sentence not

exceed their respective statutory maximums as provided elsewhere in the Code. In this case, as defendant agrees, the individual components of his sentence did not exceed their respective maximums.

¶ 144 We begin our analysis with section 5-4.5-55 of the Code (730 ILCS 5/5-4.5-55 (West 2014)), which sets forth the sentencing options for a Class A misdemeanor. That section provides in relevant part:

"CLASS A MISDEMEANORS; SENTENCE. For a Class A misdemeanor:

(a) TERM. The sentence of imprisonment shall be a determinate sentence of less than one year.

* * *

(d) PROBATION; CONDITIONAL DISCHARGE. Except as provided in Section 5-5-3 or 5-6-2 (730 ILCS 5/5-5-3 or 5/5-6-2), the period of probation or conditional discharge shall not exceed 2 years." *Id.*

Subsection (d), which sets the maximum period of probation, cites sections 5-5-3 and 5-6-2 of the Code (730 ILCS 5/5-5-3, 5-6-2 (West 2014)). Section 5-5-3 is titled "Disposition." As pertinent to subsection (d) of section 5-4.5-55, section 5-5-3 specifies instances where the trial court must sentence a defendant to imprisonment rather than probation, periodic imprisonment, or conditional discharge. See 730 ILCS 5/5-5-3(c)(2) (West 2014). Section 5-6-2 of the Code, titled "Incidents of Probation and of Conditional Discharge," is the provision upon which defendant relies here. He cites specifically subsection (f), which provides:

"(f) The court may impose a term of probation that is concurrent or consecutive to a term of imprisonment so long as the maximum term imposed does not exceed the maximum term provided under Article 4.5 of Chapter V or Article 8 of this Chapter. The court may provide that probation may commence while an offender is on mandatory supervised release, participating in a day release program, or being monitored by an electronic monitoring device." 730 ILCS 5/5-6-2(f) (West 2014).

Subsection (f) cites two articles of the Code, article 4.5 of chapter V and article 8 of chapter V. Article 4.5 of chapter V is titled "General Sentencing Provisions" and sets forth the various classes of criminal offenses and the sentences authorized (imprisonment, probation, etc.) for each class. See 730 ILCS 5/5-4.5-5 *et seq.* (West 2014). As noted, section 5-4.5-55 sets forth the sentences available for Class A misdemeanors. Article 8 of chapter V, titled "Imprisonment," addresses various subjects pertaining to the imposition of imprisonment, such as natural life imprisonment, impact incarceration, extended-term sentencing, and concurrent and consecutive terms of imprisonment. See 730 ILCS 5/5-8-1 *et seq.* (West 2014).

¶ 145 We are aware of only two decisions addressing section 5-6-2(f). In *People v. Horrell*, 381 Ill. App. 3d 571, 575 (2008), the Third District Appellate Court held that section 5-6-2(f) permits a trial court "to make a term of probation consecutive to a prison term, but only if the total sentence would not exceed the maximum *prison sentence*." (Emphasis added.) The Third District was of the opinion that the aggregate of the imprisonment and probation terms must be compared against a single term (the options being the term of imprisonment and the term of probation). The court, however, provided no statutory analysis to support its rendering of "maximum term" in section 5-6-2(f) as "maximum term *of imprisonment*," as opposed to "maximum term of probation." Reviewing the Third District's decision on appeal, the supreme

court held that section 5-6-2(f) was inapplicable to the case because it became effective after the defendant committed the charged offenses. *People v. Horrell*, 235 Ill. 2d 235, 242 (2009). The court mentioned in passing that section 5-6-2(f) "provides that a court may impose probation and imprisonment, concurrently or consecutively, as long as the maximum term does not exceed the statutory maximum." *Id.* at 240 n.3. The court did not specify which "statutory maximum" section 5-6-2(f) contemplated.

¶ 146    The goal of statutory interpretation is to ascertain and effectuate the legislature's intent, the best evidence of which is the statutory language, given its plain and ordinary meaning. *People v. Bradford*, 2016 IL 118674, ¶ 15. The phrase "maximum term" appears twice in the relevant language of section 5-6-2(f): "The court may impose a term of probation that is concurrent or consecutive to a term of imprisonment so long as the *maximum term* imposed does not exceed the *maximum term* provided under Article 4.5 of Chapter V or Article 8 of this Chapter." (Emphases added.) 730 ILCS 5/5-6-2(f) (West 2014). We agree with defendant that the first instance of "maximum term" in this language means the aggregate term, or the numerical sum of the prison term and the probation term.

¶ 147    We are aided in this conclusion by section 5-6-4(j) of the Code (730 ILCS 5/5-6-4(j) (West 2014)), which was part of the same public act (Pub. Act 93-1014 (eff. Jan. 1, 2005)) as section 5-6-2(f). Section 5-6-4(j) states:

> "(j) When an offender is re-sentenced after revocation of probation that was imposed in combination with a sentence of imprisonment for the same offense, the aggregate of the sentences may not exceed the maximum term authorized under Article 4.5 of Chapter V."

"[U]nder the doctrine of *in pari materia*, two sections of a statute dealing with the same subject will be considered with reference to one another to give them harmonious effect." *People v. Harris*, 2013 IL App (1st) 110309, ¶ 13. Sections 5-6-2(f) and 5-6-4(j) are companion provisions. Section 5-6-2(f) addresses the limits on combined sentences imposed as an original matter, while section 5-6-4(j) addresses the limits on combined sentences imposed on resentencing following revocation of a probation term that was imposed in the original combined sentence. Under these sections, any such combined sentence, imposed as an original matter or on resentencing, may not "exceed the maximum term" permitted under the general sentencing provisions. See 730 ILCS 5/5-6-2(f), 5-6-4(j) (West 2014). Section 5-6-4(j) refers to the combined term of such hybrid sentences not as the "maximum term imposed" (as does section 5-6-2(f)) but, more appropriately, as the "aggregate of the sentences." Section 5-6-4(j) confirms that what the legislature means in section 5-6-2(f) by the "maximum term" of a combined sentence of imprisonment and probation is the *aggregate term* of that sentence.

¶ 148    We do not agree with defendant, however, on the meaning of the second instance of "maximum term" in section 5-6-2(f). He proposes that "maximum term" means a single maximum term against which to compare the aggregate of the terms of imprisonment and probation. In other words, the constituent sentences in a combined sentence of imprisonment and probation are not judged against their respective maximum terms (here, for a Class A misdemeanor, 364 days of imprisonment and two years of probation). Rather, the aggregate term is compared against *one* of the maximum terms authorized. Defendant advocates for reading "maximum term" to mean the maximum term of *imprisonment*—which, in the case of a Class A misdemeanor, is shorter than the maximum probation term.

¶ 149     We reject this interpretation. Defendant's suggestion that "maximum term" means a single term against which to compare the aggregate sentence is untenable, for there is nothing in the statutory text that arbitrates between the two possible maximum terms: the maximum term of *imprisonment* or the maximum term of *probation*. Defendant claims that, in practice, the legislature uses "term" to refer to imprisonment and "period" to refer to probation "and does not use both words in the alternative." This confident assertion is spoiled by section 5-6-2(f) itself, which refers to the trial court's imposition of a "term of probation." 730 ILCS 5/5-6-2(f) (West 2014). There are two additional instances of "term of probation" in section 5-6-2 (730 ILCS 5/5-6-2(b), (g) (West 2014)) and three instances elsewhere in article 6 of chapter V (730 ILCS 5/5-6-4(a), 5-6-3.2(c)(1), (d) (West 2014)). The phrase "term of probation" also appears in articles 4.5 and 5 of chapter V. See, *e.g.*, 730 ILCS 5/5-4.5-30(d), 5-5-3(c)(2)(Z) (West 2014). Certainly, probation is also referred to as a "period" (see, *e.g.*, 730 ILCS 5/5-4.5-55(d) (West 2014)), and that indeed might be the legislature's typical usage, but given the exceptions noted, particularly those within article 6, we cannot with confidence conclude from legislative usage alone that "maximum term" in sections 5-6-2(f) and 5-6-4(j) refers to imprisonment rather than probation.

¶ 150     In our view, sections 5-6-2(f) and 5-6-4(j) simply provide that, for any sentence that combines imprisonment and probation, neither component of the sentence may exceed the maximum authorized (the "maximum term") for that component, as specified under article 4.5 of chapter V or article 8 of chapter V.

¶ 151     Defendant contends that such a construction would render section 5-6-2(f) superfluous because, when that section was adopted, there was already no question that trial courts could not impose terms of imprisonment and probation in excess of those provided in the general sentencing provisions of article 4.5 of chapter V and the provisions specific to imprisonment in article 8 of chapter V. Hence, according to defendant, the legislature must have meant to impose an additional restriction on prison and probation terms. Defendant is mistaken. Sections 5-6-2(f) and 5-6-4(j) permitted a sentencing option that was previously not available under Illinois law, and they clarified how the maximums specified elsewhere in the Code would apply to that option. Before the adoption of sections 5-6-2(f) and 5-6-4(j) in 2005, courts had some authority to combine prison and probation terms in a sentence for a single offense. For example, imprisonment was (and still is) permitted as a condition of probation, with certain qualifications. See 730 ILCS 5/5-6-3(e) (West 2004). There was, however, no specific authorization in the Code for a term of probation to run *consecutively* to a term of imprisonment for a single offense. The supreme court said as much in 1997 in *People v. Williams*, 179 Ill. 2d 331, 335 (1997). In deciding the legality of such consecutive sentencing, the court found the rule of lenity applicable because "[i]mposing consecutive sentences for a single conviction constitutes two consecutive punishments for one offense." *Id.* "[T]o sanction sentences of both prison and probation for one crime, without definite authorization in the Code, would impermissibly increase the penalty for that offense." *Id.* "Where there is no clear indication of a legislative intent to increase a punishment, the ambiguity must be construed in favor of the defendant." *Id.* Applying the rule of lenity, the court held that the Code did not permit a probation term to run consecutively to a prison term for a single offense. *Id.*

¶ 152     Sections 5-6-2(f) and 5-6-4(j) broke new ground by permitting consecutive terms of imprisonment and probation for a single offense. Necessarily, the general sentencing provisions in existence when those sections were passed did not suggest how the maximums

they prescribed would apply in the case of consecutive terms of imprisonment and probation. The general sentencing provisions did not suggest, for instance, if there would be restraints comparable to those that long governed consecutive sentences of imprisonment. See 730 ILCS 5/5-8-4(f) (West 2014) (placing caps on the aggregate maximum and aggregate minimum of consecutive sentences of imprisonment). In authorizing the new sentencing option of consecutive terms of imprisonment and probation, sections 5-6-2(f) and 5-6-4(j) clarified that the trial court has the authority to sentence up to the respective maximums for the component terms.

¶ 153    Defendant also suggests that our construction of section 5-6-2(f) "would subvert the legislative purpose of leaving some, or all, prison-time available for enforcing compliance with probation." He says: "A *maximum* term of imprisonment as a pre-condition of a *maximum* period of probation makes no sense." (Emphases in original.) This concern is misplaced. On our reading, the trial court is authorized, but not required, to impose maximum prison and probation terms in the initial sentence. Defendant claims that there is support for his position in *People v. Joseph*, 105 Ill. App. 3d 568, 570 (1982), which held that the trial court is not allowed to impose a term of probation consecutively to a prison term. *Joseph* was decided long before section 5-6-2(f) was adopted, and therefore it is inapplicable here.

¶ 154    We recognize that our interpretation sets us at odds with the Third District in *Horrell*. We are not bound by the decisions of our fellow appellate districts. *People v. Johnson*, 2015 IL App (2d) 131029, ¶ 26. Additionally, the decision in *Horrell* is not persuasive, as the Third District offered no statutory analysis to support its reading of section 5-6-2(f) as requiring that the aggregate term of imprisonment and probation be compared against a single maximum term, much less any support for its conclusion that the maximum term for comparison is the maximum term of *imprisonment* and not probation. See *Horrell*, 381 Ill. App. 3d at 575.

¶ 155    Applying section 5-6-2(f) as we have construed it, we hold that the terms of imprisonment and probation imposed in this case were valid because they did not exceed the respective maximums prescribed in section 5-4.5-55 of the Code.

¶ 156                               III. CONCLUSION

¶ 157    For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County. As part of our judgment, we grant the State's request that defendant be assessed $50 as costs for this appeal. 55 ILCS 5/4-2002(a) (West 2014); see also *People v. Nicholls*, 71 Ill. 2d 166, 178 (1978).

¶ 158    Affirmed.